## ARKANSAS STATE HIGHWAY COMMISSION
### *v.* ROBERT SIMMONS AND ALICE SIMMONS, HIS WIFE ET AL

5-6194                                          492 S.W. 2d 238

Opinion delivered April 2, 1973

*Thomas B. Keys* and *George O. Green*, for appellant.

*Kenneth C. Coffelt*, for appellees.

CARLETON HARRIS, Chief Justice. This is an eminent domain proceeding brought by the Arkansas State Highway Commission against Robert Simmons and Alice Simmons, his wife, for the acquisition of lands needed for the construction of Interstate Highway No. 430 and its facilities in Pulaski County. The lands condemned by the commission are designated as Tract No. 392 in the complaint and declaration of taking, and this tract consists of 1.23 acres, including 0.23 acre which is presently being used for a public road. The condemned tract has been used for both residential and commercial purposes, the total parcel consisting of 5.5 acres. On trial, the jury returned a verdict for appellees in the amount of $15,000, and from the judgment so entered, appellant brings this appeal. For reversal, it is simply asserted that the verdict is excessive as there is no substantial evidence to support the amount awarded.

In support of their case, appellees offered two expert witnesses, Mr. W. H. Pitcock of Little Rock and Mr. Fred A. Degear of Mabelvale. The State offered three witnesses in support of its theory that appellees' remaining lands

after the taking were of greater value than before the taking, it being contended that the property was enhanced in value due to the location of the remainder adjacent to an interchange. We, of course, are concerned only with whether there was substantial evidence to support the award.

We agree that the witnesses did not sufficiently demonstrate, or give a satisfactory explanation, of how they arrived at the amount of damages to which they testified. Both witnesses reached the same identical figure, $20,700 as the amount of damage suffered by Simmons and wife, and they detailed the value of buildings, including a residence on the Simmons property. However, it is apparent that they were unfamiliar with various facts which are pertinent in determining the amount of just compensation. For instance, neither witness was familiar with the highway plans, and one apparently reached his conclusions without seeing the plans. Pitcock evidently derived his information as to the type of access, or the amount of access, to the property after the taking from what he was told by Simmons. In answer to a question relative to the type and amount of access Simmons would have to his property after the taking, Pitcock replied: "The way he showed it to us about fourteen feet on the east end of it right there at the corner. Right there by that gas meter." Pitcock was also unaware of the fact that the Simmons' south property line was in the middle of Colonel Glenn Road and he did not know that the 0.23 of an acre was in the Colonel Glenn Road.[1] Of course, this portion of the

[1]"Q. Did you know that—how many acres was in the taking?

A How many was in the taking?

Q Yes.

A One twenty-three.

Q Did you know that twenty-three hundredths of that one point twenty-three is in the Colonel Glenn Road?

A No, sir, I didn't know that.

Q You don't know. So you really don't know how much property is being taken from Mr. Simmons, do you?

A According to the dope y'all put out it was one twenty-three.

property which was being used as a road still belonged to appellees, but it is important that this piece of property could not be utilized for private purposes. Pitcock answered numerous questions with regard to the land taken with statements bearing the words "he said". As to making a study of comparative sales in the area, the witness stated, "No sales have been in the area to compare with this *** I didn't find any." He said that he made no search to ascertain if comparable sales had been made. Pitcock valued the land only at $5,000 an acre, and he finally stated that the only sale he knew of hadn't "been too recent. Probably a couple of years ago. Right down below it there, on the corner of Bauman Road. Eight acres sold for $25,000." The record further reveals:

"Q And how much is that per acre?

A I didn't figure it out. I don't know.

Q Maybe I can help you. Would that be approximately $3,000 an acre?

A Something like that. A little more.

Q You're putting $5,000.00 on this, aren't you?

A Yes. Yes.

Q It's more valuable property?

A It's what?

Q It's more valuable property than this down on the corner?

---

Q What else does it say? Will you show it to me.

A Yes, sir, I'll show it to you. There it is.

Q Will you read on the bottom of that to the jury what it says there? ***

A Containing one twenty-three hundredths acres more or less which twenty-three hundredths of an acre more or less being used for public road.

Q And so we're actually talking about one acre that's being taken from Mr. Simmons that is in use at this time?"

A Well, it's on the corner, yes.

Q Mr. Pitcock, let me see if I can ask it again. Which property do you consider more valuable—this property down on Bauman Road that you are talking about for $3,000.00 an acre or the subject property which you say is $5,000.00 an acre?

A At the time it was sold there it would be a toss-up between them because one of them would be worth more by a few more dollars because it was on the corner.

Q In other words, the property on Bauman Road would be worth more because it was on a corner?

A Very little.

Q But possibly a little bit more?

A More."

Yet, though stating that the Bauman property was more valuable, the Simmons property was valued at approximately $2,000 more per acre. Further examination of the witness reflects a lack of knowledge on another matter that was very pertinent. From the record:

"Q Now, you've been in business for 30 years in Pulaski County, right, sir?

A Yes, sir.

Q Now, have you seen interchanges placed along the interstate highway in Pulaski County?

A Yes, sir.

Q What happens to these places that are fortunate enough to be right next to that interchange?

A (No response)

Q Do they have a sale value?

A They all try to get in business along there.

Q Do you know of any of those sales?

A Do I know what?

Q Of any of those sales around the interchange?

A No, I don't know of any.

Q You don't deal with that?

A I would if I got the opportunity.

Q All right. Do you know something about the price that these lands sell for next to. . .

A On these cloverleafs?

Q Yes, sir.

A No, I don't."

As previously stated, it was the position of the commission that the coming of the interstate had enhanced the value of the lands, and appellant's proof was directed to that contention.[2]

Degear testified that he and Pitcock made separate appraisals, though he stated that the latter held the tape for him while he was measuring.

The witness (Degear) testified that he looked at the plans but was not capable of reading them. He agreed

[2]The western boundary of appellees' land was cut off for entrance and exit purposes because of the Commission's proposed right-of-way and limits of controlled access. The southern portion was also affected as to ingress and egress, and the witnesses are in disagreement as to the amount of footage available for access purposes. Appellees assert that the proposed right-of-way line only leaves fifteen feet for access purposes along the Colonel Glenn Road; however, the Commission contends that one hundred forty-five feet of frontage on Colonel Glenn Road for ingress and egress will be afforded, this by virtue of the fact that under the adopted plans, the Commission will only fence off the land condemned to the extent of the limits of controlled access, and not to the proposed right-of-way line. From the testimony in the record, it appears that appellees consider this footage to be of no value for the reason that it is felt the Commission could later also fence this portion.

that he would consider the property strategically located relative to the freeway if it had three or four hundred feet of frontage, "usable frontage", but he insisted that it only had fourteen feet frontage and thus had little or no value for commercial purposes. From the record:

"Q All right. If I told you it had 145 feet of usable frontage for ingress and egress would that change what you are saying?

A That would give it a little more value, yes, sir.

Q You mean an ingress from 14 feet to 145 would only give it a little more value?

A Well, the man's home there, he don't want a business out in front of his home."

There really is no need to discuss Degear's testimony further to determine whether it constitutes substantial evidence for the reason that he and Pitcock discussed their figures and adjusted their differences to reach a common figure, but the record does not reflect what changes were made in order to do this. From the record:

"Q Mr. Degear, is it by coincidence only that you and Mr. Pitcock both arrived at the same figure of $20,-700?

A We went over it together. We went over those figures we have there and arrived at the figure together.

Q Did you not make an independent appraisal and he make and independent appraisal and you compared appraisals to see. . .

A Yes, sir, we went out there and we made our independent appraisals and then we put them together. . .

Q And you compromised and came up with the figure?

A Came up with the answer.

Q You compromised the figures and. . . ***

A No, we just came up with that figure. And I think it's very justifiable and if I didn't I wouldn't be stating it.

Q I appreciate that. But did you think that his figures were different from yours?

A When we first started out I believe we were a little apart. I don't remember how much.

Q Well, did you adopt some of his figures or did he adopt your figures or how did you do it?

A There's nothing wrong in discussing the thing and where I might be wrong and where he might be wrong. . .

Q I didn't ask you that. I asked you if you adopted some of his figures. That's all I asked you. Yes or no.

A If we did what?

Q Did you adopt some of his figures? Did you change some of the figures you had to his? Did he change some of his figures to what you had?

A Really we changed some of the figures that we both had.

Q Okay, both of you changed?

A Changed the figures.

Q You took part of his and he took part of yours and you both came up with the same figure of $20,700?

A Yes, sir. We absolutely did, yes, sir."

Of course, even if it were found that Degear's testimony could be considered substantial, the judgment would have to be reversed because in reaching its verdict,

we do not know whether the jury was persuaded by the testimony of Pitcock or the testimony of Degear.

Reversed and remanded.